2009 ND 218

**Interest of W.K.**

**M.M.K., Petitioner and Appellee**

v.

**W.K., Respondent and Appellant.**

**No. 20090351.**

Supreme Court of North Dakota.

Dec. 22, 2009.

Gary E. Euren (argued), Assistant State's Attorney, Fargo, ND, for petitioner and appellee.

Douglas W. Nesheim (argued), Fargo, ND, for respondent and appellant.

KAPSNER, Justice.

[¶ 1] W.K. appeals an order for involuntary hospitalization and treatment and an order to involuntarily treat with medication. The orders committed W.K. to the North Dakota State Hospital for up to ninety days and allowed the hospital to treat her with medication during that time. We hold the district court was clearly erroneous to find clear and convincing evidence supported the orders. We reverse both orders.

I

[¶ 2] W.K.'s brother, M.K., petitioned for her involuntary commitment, asserting W.K. was mentally ill and, if she were not hospitalized and treated, a serious risk of harm existed. The petition alleged: W.K. had been hospitalized for mental illness on four previous occasions; she recently left a mental health facility in Maryland against medical advice; she lost custody of her child due to mental illness; she does not perform activities of daily living (ADLs); she is experiencing hallucinations and delusions; and she is a potential danger to herself. After M.K. filed the petition, the Cass County state's attorney requested an investigation of the allegations and an evaluation of W.K.'s mental health.

[¶ 3] A representative from Southeast Human Services Center visited M.K.'s apartment, where W.K. was staying at the time. The representative reported W.K. was "sleeping on the couch in the living room. She is still in her pajamas at 4 [p.m.] and has not performed [ADLs] this day." The representative also reported W.K. denied having any mental health issues or symptoms, and "[s]he is angry with her family for invading her rights." The representative concluded W.K. "has no insight [in]to her situation and it is apparent she is having disturbed thought processes.... She can not [sic] plan for how she would take care of her own basic needs if [M.K.] was not caring for her." The representative reported W.K. met the criteria for involuntary placement at the State Hospital. In response to the representative's report, the district court ordered an expert examination. Dr. William Pryatel, a licensed psychiatrist at the State Hospital, examined W.K. Following the exam, Dr. Pryatel created a report of his findings and filed a request to treat with medication with the district court.

[¶ 4] The district court held a treatment hearing on October 20, 2009. W.K. testified that, on the day the Cass County social services representative visited M.K.'s apartment, she had showered and was simply sitting on the couch watching television. W.K. stated she left the apartment only a few times during the first few weeks of her visit to Fargo because she did not have keys to the apartment. W.K. denied suffering from hallucinations or delusions and testified she generally performs her ADLs.

[¶ 5] W.K. testified she has no history of mental illness beyond suffering an anxiety attack in 1999. After the attack, W.K. stated she took the prescription drug Risperdal for about four months and attended group therapy. W.K. testified that, prior to coming to Fargo, she was in a mental health facility in Maryland because her sister called social workers and falsely told them she had complained her food was poisoned. W.K. stated the doctors at the facility did not diagnose her with mental illness or treat her with medication. She testified the doctors ruled out all problems, except possible financial issues with her family. At the time W.K. was admitted to the Maryland facility, she stated her sister was paying her rent. When she returned to her apartment after being discharged from the facility, W.K. testified she found her roommates had changed the locks. She stated M.K. then invited her to visit him in Fargo, which is why she was staying at M.K.'s apartment when he filed the petition. She testified M.K. filed the petition because of family discord, not because she is mentally ill.

[¶ 6] In addition, W.K. testified she lost custody of her thirteen-year-old daughter in April 2008. W.K. stated that, shortly before losing custody, she had resigned from her job as a licensed practical nurse to pursue gospel songwriting and to work on a CD. W.K. testified she lost custody because her sister called social workers and falsely told them she was not providing for her daughter, and that she had threatened her daughter so she could continue to preach God's word without interference. However, W.K. stated she always provided for her daughter even after resigning from her job through savings and child support. W.K. stated she continues to pursue a gospel songwriting career and has federal copyrights on her songs. She testified she goes to a recording studio in Maryland, which she pays for with her savings.

[¶ 7] M.K. also testified at the hearing. He stated W.K. called him after her release from the Maryland facility and told him she was locked out of her apartment, at which time he invited her to visit him in Fargo. During the month W.K. stayed at his apartment, M.K. testified she left only three times and watched television and *The Lion King* constantly. He also stated W.K. often stared blankly into space and laughed to herself. M.K. testified W.K. slept on the couch instead of a bed and frequently stayed up until the early morning listening to gospel music on the internet. M.K. stated he filed the petition because of this "awkward" behavior.

[¶ 8] Dr. Pryatel testified he interviewed W.K. and concluded she is mentally ill with schizophrenia, paranoid type. Dr. Pryatel noted Risperdal, the medication W.K. testified she used following an anxiety attack in 1999, is typically prescribed for schizophrenia. Dr. Pryatel also testified he understands W.K. was hospitalized for mental illness in 2004, received involuntary medication at that time, and improved greatly thereafter. He stated W.K. has paranoia and believes her siblings have it out for her. Dr. Pryatel also testified W.K. is grandiose because she believes she

is going to make a lot of money in her gospel music career.

[¶ 9] Dr. Pryatel stated he was not able to review W.K.'s medical records from the Maryland mental health facility where she recently stayed, because W.K. would not give permission for their release. Dr. Pryatel testified he primarily based his findings on information provided by M.K., as well as the Cass County social services report. He also stated that, during the three days W.K. spent at the State Hospital prior to the hearing, she performed her ADLs. Dr. Pryatel testified W.K. is not suicidal and does not have violent tendencies towards others.

[¶ 10] Dr. Pryatel testified there was "likely" a serious risk of harm to W.K. if she did not receive treatment. Without treatment, Dr. Pryatel stated W.K. was likely to suffer a substantial deterioration of her physical health, because she is unable to provide food, clothing, and shelter for herself and does not complete her ADLs. Dr. Pryatel also stated W.K. was likely to suffer a substantial deterioration of her mental health, because "the natural tendency of the schizophrenia is to get worse" if no treatment is received. He also testified W.K.'s failure to take care of her physical health would aggravate her mental health problems. Dr. Pryatel stated inpatient hospitalization and medication were necessary to provide W.K. with effective treatment, and no less restrictive treatment options were appropriate. Dr. Pryatel also stated the benefits of treatment with medication outweigh the known risks, but W.K. refused all medication offered to her.

[¶ 11] The district court found clear and convincing evidence established W.K. is mentally ill and suffers from schizophrenia. The district court also found that, if not treated, W.K. presents a serious risk of harm to herself because of the substantial likelihood of a substantial deterioration in her physical and mental health. Finally, the district court found the least restrictive form of treatment for W.K. is inpatient hospitalization with medication. Therefore, the district court ordered involuntary hospitalization and treatment, as well as involuntary treatment with medication. The district court committed W.K. to the State Hospital for up to ninety days, allowing the hospital to treat her involuntarily with Risperdal, Invega, or Haloperidol during that time. W.K. now appeals, arguing the district court erred by ordering both involuntary hospitalization and treatment and involuntary treatment with medication.

## II

[¶ 12] Our review of an appeal under N.D.C.C. ch. 25–03.1 is limited to a review of the procedures, findings, and conclusions of the district court. *Interest of D.A.*, 2005 ND 116, ¶ 11, 698 N.W.2d 474. To balance the competing interests of protecting a mentally ill person and preserving that person's liberty, the district court uses a clear and convincing standard of proof, while we use the more probing clearly erroneous standard of review. *Id.* A district court's finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if there is no evidence to support it, or if, although there is some evidence to support it, on the entire record this Court is left with a definite and firm conviction it is not supported by clear and convincing evidence. *Id.*

## A

[¶ 13] Section 25–03.1–07, N.D.C.C., allows a person to be involuntarily admitted to the State Hospital only if the district court finds the person requires treatment as defined under

N.D.C.C. § 25–03.1–02(12). A person requires treatment if the district court finds by clear and convincing evidence: (1) the person is mentally ill, and (2) if not treated, there is a reasonable expectation that the person presents a serious risk of harm to themself, others, or property. N.D.C.C. § 25–03.1–02(12). A "serious risk of harm" exists when there is a substantial likelihood of:

  a. Suicide, as manifested by suicidal threats, attempts, or significant depression relevant to suicidal potential;

  b. Killing or inflicting serious bodily harm on another person or inflicting significant property damage, as manifested by acts or threats;

  c. Substantial deterioration in physical health, or substantial injury, disease, or death, based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care; or

  d. Substantial deterioration in mental health which would predictably result in dangerousness to that person, others, or property, based upon evidence of objective facts to establish the loss of cognitive or volitional control over the person's thoughts or actions or based upon acts, threats, or patterns in the person's treatment history, current condition, and other relevant factors, including the effect of the person's mental condition on the person's ability to consent.

*Id.* Courts presume a person does not require treatment. *Interest of H.G.,* 2001 ND 142, ¶ 4, 632 N.W.2d 458. The petitioner bears the burden to prove by clear and convincing evidence the respondent is a "person requiring treatment." *Id.*

[¶ 14] We hold the district court was clearly erroneous to find clear and convincing evidence supported the order for involuntary hospitalization and treatment. While it may be in W.K.'s best interests if she were hospitalized and treated medically, before the State can deprive a person of liberty for this well-intentioned purpose, it must meet the statutory requirements. To establish a serious risk of harm, the State must show a *substantial* likelihood of *substantial* deterioration in physical or mental health. *See* N.D.C.C. § 25–03.1–02(12) (emphasis added). We have previously recognized the term "substantial" means "considerable" or "significantly great." *State v. Barth,* 2001 ND 201, ¶ 19, 637 N.W.2d 369 (quoting *Merriam–Webster's Collegiate On–Line Dictionary,* http://www.m-w.com (2001)). Therefore, to establish a person presents a serious risk of harm to themself, the State must demonstrate that, without treatment, there is a great likelihood that the person will suffer a significant decline in physical or mental health. The burden of proof is high, and one the State failed to meet in this matter.

[¶ 15] Dr. Pryatel testified W.K. is mentally ill and has schizophrenia, paranoid type. He also stated it is the natural tendency of schizophrenia to become worse without treatment. As a result, Dr. Pryatel testified W.K. would "likely" suffer a substantial deterioration in physical and mental health without involuntary hospitalization and treatment. Dr. Pryatel stated he primarily based his conclusions on the information provided by M.K. and the Cass County social services report. The petition filed by M.K. stated: W.K. had been hospitalized for mental illness on four previous occasions; she recently left a mental health facility in Maryland against medical advice; she lost custody of her child due to mental illness; she does not perform activities of daily living; she is experiencing hallucinations and delusions; and she is a potential danger to herself.

M.K.'s testimony repeated many of these allegations. The social services report indicated, on the day of the visit, W.K. was wearing pajamas and sleeping at 4:00 p.m. The report also stated W.K. had not completed her ADLs, though W.K. testified she showered that day. W.K. also stated M.K. filed the petition due to family discord. In its oral findings of fact, the district court stated W.K. testified to this fact "forcefully and intelligently."

[¶ 16] This evidence does not clearly and convincingly establish that, without involuntary treatment and hospitalization, there is a serious risk of harm to W.K. Dr. Pryatel testified W.K. was not suicidal and does not have violent tendencies. W.K. had been living comfortably in her brother's home, and the State presented no evidence she presently lacked in food, shelter, or clothing. The statute requires substantial determinations based upon recent poor self-control or judgment in providing one's shelter, nutrition, or personal care. Accepting the hospitality of one's sibling does not demonstrate this requirement. While M.K. reported W.K. had not been performing her ADLs, Dr. Pryatel testified she did perform them while at the State Hospital. This evidence does not clearly and convincingly establish a substantial likelihood of a substantial deterioration in W.K.'s physical health.

[¶ 17] Similarly, the evidence does not clearly and convincingly establish a substantial likelihood of a substantial deterioration in W.K.'s mental health. Dr. Pryatel did not review W.K.'s medical records regarding previous mental health issues. Rather, Dr. Pryatel testified W.K. was likely to suffer a substantial deterioration in mental health because persons suffering from schizophrenia naturally tend to worsen without treatment. However, a generalized natural tendency does not establish a substantial likelihood for a particular individual. Nor does a person wearing pajamas at 4:00 p.m. establish a substantial deterioration in mental health. Therefore, the district court was clearly erroneous to find that, without treatment, there is a substantial likelihood of a substantial deterioration in W.K.'s mental health.

[¶ 18] We hold the district court was clearly erroneous to find W.K. qualified as a "person requiring treatment" under N.D.C.C. § 25–03.1–02(12) because the evidence does not clearly and convincingly establish that, if W.K. goes untreated, there is a reasonable expectation of a serious risk of harm. We reverse the district court's order for involuntary hospitalization and treatment.

### B

[¶ 19] W.K. next contends the district court clearly erred in issuing the order to treat with medication. Under N.D.C.C. § 25–03.1–18.1(1)(a), before a district court may order involuntary treatment with prescribed medication, the treating psychiatrist and another licensed physician must certify, and the district court must find by clear and convincing evidence:

(1) That the proposed prescribed medication is clinically appropriate and necessary to effectively treat the patient and that the patient is a person requiring treatment;

(2) That the patient was offered that treatment and refused it or that the patient lacks the capacity to make or communicate a responsible decision about that treatment;

(3) That prescribed medication is the least restrictive form of intervention necessary to meet the treatment needs of the patient; and

(4) That the benefits of the treatment outweigh the known risks to the patient.

N.D.C.C. § 25–03.1–18.1(1)(a). Therefore, like orders for involuntary hospitalization and treatment, the district court may only order involuntary treatment with medication if the court finds the person qualifies as a "person requiring treatment." A person requires treatment if the district court finds by clear and convincing evidence: (1) the person is mentally ill, and (2) if not treated, there is a reasonable expectation that the person presents a serious risk of harm to themself, others, or property. N.D.C.C. § 25–03.1–02(12).

[¶ 20] As stated in section II(A), the district court was clearly erroneous to find W.K. qualified as a "person requiring treatment" under N.D.C.C. § 25–03.1–02(12), because the evidence does not clearly and convincingly establish that, if W.K. goes untreated, there is a reasonable expectation of a serious risk of harm. Therefore, because the evidence does not establish W.K. qualifies as a "person requiring treatment," the district court also erred by ordering involuntary treatment with medication. We reverse the district court's order. Further, because we reverse the district court's order, it is unnecessary to address W.K.'s final argument regarding the propriety of less restrictive treatment.

### III

[¶ 21] We hold the district court was clearly erroneous to find clear and convincing evidence supported the order for involuntary hospitalization and treatment and the order to involuntarily treat with medication. We reverse both orders.

[¶ 22] GERALD W. VANDE WALLE, C.J., CAROL RONNING KAPSNER, and DANIEL J. CROTHERS, JJ., concur.

SANDSTROM, Justice, dissenting.

[¶ 23] Because the evidence supports finding W.K. suffers from schizophrenia—a severe mental illness—is in a dramatic downward decline, and without treatment is likely to suffer substantial deterioration in her physical and mental health, the district court did not err in finding clear and convincing evidence to support the order for hospitalization and treatment and the order to treat with medication. I would affirm. I therefore respectfully dissent.

### I

[¶ 24] Two years ago, W.K. was living independently, had custody of her daughter, and was employed as a licensed practical nurse. Since that time, she has resigned from her nursing career, her daughter has been removed from her custody, and she has become dependent on her siblings for her care. In October, her brother, M.K., concerned for W.K.'s safety, petitioned for her involuntary commitment so that she could get the treatment necessary to prevent serious harm. When Southeast Human Services Center representatives visited M.K.'s apartment, they found W.K. in her pajamas at four o'clock in the afternoon. They reported that W.K. had not completed her activities of daily living that day, that she had no insight into her situation, and that it was apparent she was having disturbed thought processes. They also reported W.K. could not plan for how she would take care of her own basic needs if her brother were not caring for her.

### A

[¶ 25] The district court did not clearly err when it found by clear and convincing evidence that W.K. is a mentally ill person requiring treatment. Dr. William Pryatel, a licensed psychiatrist at the North Dakota State Hospital, examined W.K. and diagnosed her with schizophrenia, paranoid type. Dr. Pryatel testified there was a

serious risk of harm to W.K. if she did not receive medication and inpatient hospitalization. He focused on two primary areas: 1) a likelihood of substantial deterioration of W.K.'s physical health, because she is unable to provide food, clothing, and shelter for herself and does not complete activities of daily living; and 2) a likelihood of substantial deterioration of W.K.'s mental health, because the natural tendency of schizophrenia is to worsen if no treatment is received. Dr. Pryatel testified W.K. has paranoia and believes her siblings have it out for her. He also testified she is grandiose and believes she is going to make a lot of money on a gospel CD she is developing, or thinks she is developing.

[¶ 26] Additionally, schizophrenia is a severe mental illness. According to the DSM–IV manual, the authoritative text on mental disorders published by the American Psychiatric Association, the signs and symptoms of schizophrenia are associated with marked social or occupational dysfunction. *See* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 298 (rev. 4th ed. 2000) (describing the essential features of schizophrenia). The characteristic symptoms of schizophrenia involve a range of cognitive and emotional dysfunctions, including perception, inferential thinking, language and communication, behavioral monitoring, affect, fluency and productivity of thought and speech, hedonic capacity, volition and drive, and attention. *Id.* at 299. The essential feature of the paranoid type of schizophrenia is the presence of prominent delusions (usually persecutory or grandiose) or auditory hallucinations. *Id.* at 313. The persecutory nature of the features may predispose affected individuals to suicidal behavior, and the combination of persecutory and grandiose delusions with anger may predispose the individuals to violence. *Id.* at 314. Additionally, a majority of schizophrenic individuals have poor insight regarding the fact that they have a psychotic illness, which predisposes them to noncompliance with treatment and has been found to be predictive of higher relapse rates, increased number of involuntary hospital admissions, poorer psychosocial functioning, and a poorer course of illness. *Id.* at 304. The life expectancy of individuals with schizophrenia is shorter than that of the general population for a variety of reasons. *Id.*

[¶ 27] The majority claims the State did not demonstrate that without treatment, there is a great likelihood W.K. will suffer a significant decline in physical or mental health, and thus did not demonstrate that W.K. is a "person requiring treatment." W.K. has schizophrenia, a serious mental illness. Two years ago, she was living independently. Since that time, she has lost custody of her daughter, resigned from her nursing career, and become reliant on her siblings for her care. The majority does not specify how much further W.K. needs to decline before it would agree that she presents a serious risk of harm to herself, but she is already in a downward spiral. Dr. Pryatel testified W.K. is paranoid and grandiose. He testified there is a serious risk of harm to W.K. if she does not receive medication and inpatient hospitalization. Dr. Pryatel's report also concluded there was a "substantial likelihood" of "substantial deterioration" in W.K.'s physical and mental health. Southeast Human Services Center representatives reported that W.K. had no insight into her situation, that she was having disturbed thought processes, and that she could not plan for how she would take care of her own basic needs if her brother were not caring for her.

[¶ 28] Considering Dr. Pryatel's testimony and report, the report of Southeast Human Services Center representatives,

and the nature of schizophrenia itself, the district court did not clearly err when it found by clear and convincing evidence that W.K. is a mentally ill person requiring treatment.

## B

[¶ 29] Additionally, the district court did not clearly err when it found clear and convincing evidence of the need for involuntary treatment with prescribed medication under N.D.C.C. § 25–03.1–18.1(1)(a). At the treatment hearing, Dr. Pryatel testified that on the basis of his diagnosis and history, Risperdal, Invega, or Haloperidol are clinically appropriate and necessary to effectively treat W.K. He testified medication was offered to W.K., but she refused to take it. Dr. Pryatel testified medication is the least restrictive form of treatment, because less invasive treatments such as psychotherapy and group therapy have not been found to be efficacious for treatment of schizophrenia. He testified that while the medication can cause drowsiness, short-and long-term motor side effects, and metabolic side effects, the benefits of the medication outweigh the risks. He testified that once W.K. becomes stable with medication, she will be able to participate in group therapy as part of her treatment plan. M.K.'s petition stated that when W.K. was previously given involuntary medication, she improved to the extent that she was able to go back to school and become a licensed practical nurse. The evidence and testimony presented provided a sufficient basis for the district court to find clear and convincing evidence on each of the four factors of N.D.C.C. § 25–03.1–18.1(1)(a).

## C

[¶ 30] Finally, the district court did not clearly err in failing to order a less restrictive alternative for W.K.'s treatment. To comply with the requirements of N.D.C.C. § 25–03.1–21(1), the district court is required to make a two-part inquiry: 1) whether a treatment program other than hospitalization is adequate to meet the individual's treatment needs; and 2) whether an alternative treatment program is sufficient to prevent harm or injuries which an individual may inflict on himself or others. *Interest of J.S.*, 2006 ND 143, ¶ 6, 717 N.W.2d 598. The court must find by clear and convincing evidence that alternative treatment is not adequate or hospitalization is the least restrictive alternative. *Id.* A reporting doctor may reasonably conclude in some cases that less restrictive alternatives to hospitalization do not exist. *Id.*

[¶ 31] Dr. Pryatel testified suitable, less restrictive treatment for W.K. is not available. His report of examination also stated alternative treatment is not in the best interests of W.K. Dr. Pryatel testified W.K. does not have insight into her problems. He testified that without treatment, W.K. is likely to experience a substantial deterioration in both physical and mental health because she is not able to provide for herself and because schizophrenia tends to worsen without treatment. He testified less invasive treatments for schizophrenia, such as psychotherapy and group therapy, have not been found to be effective. Dr. Pryatel's report stated W.K. refuses to engage in any outpatient setting. The Southeast Human Services Center representatives reported the same. Considering the evidence presented, the district court did not clearly err when it found by clear and convincing evidence that inpatient hospitalization is the least restrictive alternative.

## II

[¶ 32] The district court did not clearly err when it found by clear and convincing

evidence that W.K. is a mentally ill person requiring inpatient treatment. The court did not clearly err in issuing the order to treat with medication, and it did not clearly err in failing to order a less restrictive alternative for treatment. I would affirm the orders of the district court.

[¶ 33]  DALE V. SANDSTROM. MARY MUEHLEN MARING, J., concurs.